UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------- X

WILLIAM WYATT,
10670 Highway 28, Whitwell, Tennessee 37397;

FREDA WYATT HODGE,
91 Crothers Drive, Hamilton, Ohio 45013;

BESSIE CAROL WYATT NISWONGER,
1102 James Road, Hamilton, Ohio 45013;

RUTH ROGERS,
631 East Lakeshore Drive, Edelstein, Illinois 61526;

RITA WYATT FORDYCE,
629 Meadowbrook Drive, Shepherdsville, Kentucky 40165;

ESTATE OF GENEVA WYATT RUCKER, deceased, by WILLIAM WYATT,
10670 Highway 28, Whitwell, Tennessee 37397;

ESTATE OF DONALD EARL WYATT, deceased, by ROSEMARY WYATT,
P.O. Box 124, Livingston, Kentucky 40445;

RALPH WYATT,
2325 Gray's Bend Road, Centerville, Tennessee 30733;

ESTATE OF KENNETH ROGER WYATT, deceased, by WILLIAM WYATT,
10670 Highway 28, Whitwell, Tennessee 37397;

ESTATE OF LOTTIE K. WYATT, deceased, by WILLIAM WYATT,
10670 Highway 28, Whitwell, Tennessee 37397;

ESTATE OF HOBERT WILLIAM WYATT, deceased, by WILLIAM WYATT,
10670 Highway 28, Whitwell, Tennessee 37397;

-and-

Docket no. 24-cv-_____

**COMPLAINT**

ESTATE OF RAYMOND GARY WYATT, deceased, by
ZELMA WYATT HENSLEY,
1027 Bert Allen Road, London, Kentucky 40741,

                              Plaintiffs,
            -against-

THE SYRIAN ARAB REPUBLIC,
Foreign Minister Faisal Mekdad
Ministry of Foreign Affairs
Next to al-Assad University Hospital
Next to Presidency of the Council of Ministers Building
Kafar Soussa, Damascus, Syria,

                              Defendants.

------------------------------------------------------------------- X

Plaintiffs, by their counsel, complain of the Defendant, and hereby allege for their Complaint as follows:

## INTRODUCTION

1. This is a civil action pursuant to the state-sponsored terrorism exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*. for solatium damages arising from the abduction on August 30, 1991, near Elmali Village in Bingol Province, Turkey and holding hostage of Ronald Wyatt in Turkey for twenty-one days by terrorists belonging to the Kurdistan Workers Party ("PKK"). An earlier action by Ronald Wyatt's estate and by another victim of the same kidnapping, Marvin T. Wilson, and members of both of their families, against the Syrian Arab Republic ("Syria"), *Wyatt v. Syrian Arab Republic,* 08-cv-502 (RCL), resulted in a judgment of $38 million in compensatory damages and $300 million in punitive damages to the plaintiffs in that action. The present plaintiffs were not plaintiffs in that earlier action, and bring this action based on the same factual allegations for their own solatium damages.

-2-

## **JURISDICTION AND VENUE**

2. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1330-1332, 1367, 1605 note, and 1605A(a).

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4) and the rules of pendent venue.

## **THE PARTIES**

4. Ronald E. Wyatt was a United States citizen *see* Passport of Ronald Eldon Wyatt, ECF No. 36–1[1], who was abducted and held hostage by the PKK. He died in of cancer in 1999, Decl. Pl. Mary Nell Wyatt ("Mary Wyatt Decl.") ¶¶ 3, 14, ECF No. 34–3.

5. Plaintiff William Wyatt is the brother of Ronald E. Wyatt, and is a United States citizen and resident of the State of Tennessee.

6. Plaintiff Freda Wyatt Hodge is the sister of Ronald E. Wyatt, and is a United States citizen and resident of the State of Ohio.

7. Plaintiff Bessie Carol Wyatt Niswonger is the sister of Ronald E. Wyatt, and is a United States citizen and resident of the State of Ohio.

8. Plaintiff Ruth Rogers is the sister of Ronald E. Wyatt, and is a United States citizen and resident of the State of Illinois.

9. Plaintiff Rita Wyatt Fordyce is the sister of Ronald E. Wyatt, and is a United States citizen and resident of the State of Kentucky.

---

[1] Unless otherwise noted, references to ECF entries refer to the docket in *Wyatt v. Syrian Arab Republic,* 08-cv-502 (RCL).

10. Geneva Wyatt Rucker, deceased, was the sister of Ronald E. Wyatt, and was a United States citizen and resident of the State of Tennessee.

11. Donald Earl Wyatt, deceased, was the brother of Ronald E. Wyatt, was a United States citizen and resident of the State of Kentucky.

12. Plaintiff Ralph Wyatt is the brother of Ronald E. Wyatt, and is a United States citizen and resident of the State of Tennessee.

13. Plaintiff Kenneth Roger Wyatt, deceased, was the brother of Ronald E. Wyatt, was a United States citizen and resident of the State of Tennessee.

14. Plaintiff Lottie K. Wyatt, deceased, was the mother of Ronald E. Wyatt, was a United States citizen and resident of the State of Tennessee.

15. Plaintiff Hobart William Wyatt, deceased, was the father of Ronald E. Wyatt, was a United States citizen and resident of the State of Tennessee.

16. Defendant Syria is and was, at all times relevant hereto, a foreign state within the meaning of 28 U.S.C. § 1603, designated continuously since 1979 as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j))

## UNDERLYING FACTS[2]

**A.   The Kidnapping**

17. In August 1991 Marvin Wilson and Ronald Wyatt were driving with a guide and several others towards a possible archeological site[3] in the mountains of Ararat in Turkey when

---

[2] The following facts are copied largely verbatim from the findings of fact in *Wyatt v. Syrian Arab Republic,* 08-cv-502 (RCL).

[3] The men were "research[ing] a location where [they] believed remnants of the biblical Noah's Ark resides." Marvin Wilson Decl. ¶ 5. Mr. Wilson states that the men had "secured the

they came across a commercial passenger bus stopped on the road. Decl. Marvin T. Wilson ("Marvin Wilson Decl."), ECF No. 34–1, ¶ 6. After they stopped their vehicle, several gunmen—who the victims later learned were PKK terrorists—"came running" from the stopped bus towards them, "yelling and screaming, and pointing their weapons at [them]." *Id.* After their guide informed the gunmen that Mr. Wilson and Mr. Wyatt were Americans, the gunmen took the two men captive at gunpoint along with their American and English companions. *Id.* ¶ 7. The gunmen allowed the non-Western travelers, including the guide, to go free. *Id.* The gunmen "kept yelling and screaming" at their captives in "Turkish or Kurdish," and then began "pushing [them] around and roughing [them] up." *Id.* ¶ 8.

18.     The gunmen ordered Mr. Wilson to change out of the light clothes he was wearing into darker clothes in order to become "less visible to Turkish troops that would eventually be searching for [them]." *Id.* ¶ 9.

19.     The men were marched at gunpoint through the "Turkish wilderness" through the night. *Id.* ¶¶ 9–10. Mr. Wilson, who "grew up hunting in the wilderness," *Id.* ¶ 10, estimates that they covered "at least 25 miles, though it may have been more." *Id.* ¶ 11. He remembers the march as "torturous" and "extremely arduous," and, because of the "icy winds and the night-time cold biting through [his] soaking wet clothes," he "feared [they] were facing hypothermia." *Id.* ¶

20.     The men were prohibited from speaking with each other throughout the night. *Id.* ¶

21.     They were allowed to sleep in the morning with "no cover" in the "freezing cold." *Id.* ¶¶ 11–12.

---

permission of the Turkish government to excavate in this area and…had received a guaranty from a British aerospace company for the funding of this historic project." *Id.*

22. For several days that followed, the men were moved only at night, allowed to rest during the day, and were prohibited from talking with each other—although this last rule was subsequently relaxed. *Id.* ¶¶ 12–13. During these first days, the men were given "only a little bit of cheese to eat and then eventually some vegetables too." *Id.* ¶ 13. Moreover, the men were prohibited from attending to any personal needs without first obtaining permission from their armed captors, and were constantly monitored by them. *Id.* While in custody, Mr. Wilson lost a significant amount of weight. *Id.* The terrorists carried many weapons and told the men that if they tried to escape, the "Turks would find [them] and kill [them] so that they could blame the PKK for [their] deaths." *Id.* ¶ 14.

23. When the men heard helicopters in the area, the gunmen lined their captives up in a row and pointed guns at them as though they were going to execute them. *Id.* ¶ 17. Mr. Wilson stated that the terrorists did this to prevent them from attempting to escape. *Id.*

24. The men were marched "high up in the mountains." *Id.* ¶ 18. Mr. Wilson recalls that although it was "extremely cold," the prisoners were not given "anything to insulate [them] from the frigid weather." *Id.* ¶ 18. He recalls that the terrorists "would keep saying that they were going to release [them], and yet the days of [their] captivity dragged on endlessly." *Id.* ¶ 22.

25. The terrorists also tried to indoctrinate their captives, showing them "pictures of people being killed," telling them how "the Americans and Turks were killing innocent civilians," talking to them about Kurdish history, and discussing the "PKK manifesto." *Id.* ¶ 19.

26. Nearly three weeks after they had been abducted, the prisoners were marched overnight to an encampment of other PKK guerillas near a small town. *Id.* ¶ 23. The following night, the prisoners were packed into a small car with a driver. *Id.* During the ensuing drive, Mr. Wyatt tried to "attack" the driver so that the prisoners could escape, but the effort failed and, as

Mr. Wilson recalls, "almost caused a horrible accident." *Id.* ¶ 24.  After several hours, the driver dropped the prisoners back where they had been abducted. *Id.*  The men wandered until they found some Turkish soldiers who took them to military headquarters, and ultimately handed them over to the United States Department of State and, after lengthy interrogation, they were finally returned back home. *Id.* ¶¶ 24–27.

27. Altogether, the men were held hostage by the PKK for 21 days, *id.* ¶ 21, during which they feared for their lives. *Id.* ¶¶ 16–17, 20–21.

B. **The PKK**

28. The Kurdistan Workers' Party, or PKK, was founded in the late 1970s to bring about the establishment of an independent Kurdish state through acts of violence and terrorism, often directed at civilians. *See* Expert Report of Dr. Matthew Levitt ("Levitt Report");[4] Expert Report of Dr. Soner Cagaptay ("Cagaptay Report");[5] Testimony of Dr. Soner Cagaptay ("Cagaptay Testimony"), Evidentiary Hearing, Aug. 21, 2012.

29. The organization is based in Turkey, but maintained a presence and operated in Syria during the time of the Wilson and Wyatt kidnapping. *See* Levitt Report.

30. In addition to kidnappings, which are a "standard PKK tactic," PKK terrorists have also engaged in guerilla assaults on military targets, suicide bombings in civilian-dense urban

---

[4] A copy of Dr. Levitt's report was filed with the Court, as indicated on the exhibit list, *See* Ex. 10, ECF No. 32, though the report itself does not appear on ECF.  Dr. Levitt was accepted as an expert witness on the PKK by the Court at the August 21, 2012 Evidentiary Hearing.

[5] A copy of Dr. Cagaptay's report was filed with the Court, as indicated on the exhibit list, *See* Ex. 11, ECF No. 32, though the report itself does not appear on ECF.  Dr. Cagaptay was accepted as an expert witness on the PKK by the Court at the August 21, 2012 Evidentiary Hearing.

areas, drug trafficking, robbery, and extortion. Cagaptay Report 3–4; Cagaptay Testimony; *see also* Levitt Report.

### C.   Syria's Support of the PKK

31.   Syria supported PKK activities during the years immediately preceding the kidnapping by hosting PKK training facilities on its territory, providing shelter for PKK's leader, Abdullah Ocalan, and facilitating various forms of material support to the group including weapons, safehouses, training facilities and more. Cagaptay Report 5; Levitt Report; Report of Dr. Marius Deeb ("Deeb Report");[6] Cagaptay Testimony.

32.   Fully 95% of PKK's funding during this period came from the Syrian government, an estimated $10 million per year—a figure that excludes the provision of other forms of material support, such as safe houses, land, and weapons. Testimony of Marius Deeb ("Deeb Testimony"), Evidentiary Hearing, Aug. 21, 2012.

33.   PKK would not have been able to conduct its operations without Syrian Support. Testimony of Dr. Matthew Levitt ("Levitt Testimony"), Evidentiary Hearing, Aug. 21, 2012.

34.   PKK's activities along the Syrian-Turkish border during the period when the kidnapping occurred would have been impossible without the approval and support of the top leadership of the Syrian government, and concluded that the operations conducted by the PKK in this region was done with full knowledge and support of the leadership of the Syrian regime. Deeb Report; Deeb Testimony; Cagaptay Testimony.

---

[6] A copy of Dr. Deeb's report was filed with the Court, as indicated on the exhibit list, *See* Ex. 9, ECF No. 32, though the report itself does not appear on ECF. Dr. Deeb was accepted as an expert witness on the PKK by the Court at the August 21, 2012 Evidentiary Hearing.

35. Many sources support the close relationship between Syria and PKK during this period, including U.S. State Department reports, Turkish government reports, other reports from NGOs and academics, newspaper reports, testimony from former PKK members who either defected or were captured by the Turkish government, and several agreements between Syria and Turkey in which Syria tacitly acknowledged its connection to the PKK. Levitt Report; Cagaptay Report; Cagaptay Testimony.

36. Syria is a foreign state and has been designated a state sponsor of terrorism pursuant to 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j) continuously since 1979. U.S. Dep't of State, State Sponsors of Terrorism, http://www.state.gov/j/ct/list/c14151.htm .

**D.   Injuries of Family Member Plaintiffs**

37. The kidnapping caused severe emotional distress to the kidnapped men's family members.

38. In the previous action, the kidnapped men's two spouses and eight of their children presented claims for their solatium damages, and were granted substantial awards by this Court, in the amounts of $4,000,000 each to plaintiffs Renetta Wilson and Mary Nell Wyatt, the spouses of Marvin Wilson and Ronald Wyatt, and $2,500,000 each to Plaintiffs Daniel Wyatt, Amanda Lippelt, Michelle Schelles, Marty Wilson, Kimi Johns, Gina Wilson, Bradley Key, and Barry Key, the children of Marvin Wilson and Ronald Wyatt.

39. The plaintiffs in this action are the parents and siblings of Ronald Wyatt, and in this action they to recover their own solatium damages flowing from the kidnapping of their son and brother Ronald Wyatt.

**FIRST CLAIM FOR RELIEF**
**FOR DAMAGES UNDER 28 U.S.C. §1605A(c)**

40. The allegations set forth in the preceding paragraphs are incorporated by reference as though fully set forth herein.

41. Syria is a foreign state that since 1979 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

42. Syria provided material support and resources to the PKK, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the kidnapping of Ronald Wilson.

43. The kidnapping of Ronald Wilson did not occur within Syrian territory.

44. The kidnapping of Ronald Wilson caused each of the plaintiffs severe injury including pecuniary loss and loss of income, loss of guidance, companionship and society, loss of consortium, severe emotional distress and mental anguish, and solatium damages.

45. As a direct and proximate result of the conduct of Syria, Plaintiffs suffered the injuries and harm described herein.

46. Alternatively, Syria conspired with and aided and abetted the PKK within the meaning of 28 U.S.C. §§ 1605A, 1606, to enable the PKK's acts of kidnapping complained of here.

47. Syria is therefore liable under 28 USC § 1605A(c) for the full amount of Plaintiffs' damages.

48. The conduct of the defendant was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

**JURY DEMAND**

Plaintiffs demand trial by jury of all issues legally triable to a jury.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs demand judgment as follows:

(a) Judgment against all defendants, jointly and severally, for compensatory damages in an amount to be determined at trial;

(b) Judgment against all defendants, jointly and severally, for punitive damages in an amount to be determined at trial;

(c) Plaintiffs' costs and expenses;

(d) Plaintiffs' attorneys fees; and

(e) Such other and further relief as the Court finds just and equitable.

Dated: January 4, 2024
Brooklyn, New York

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Counsel for Plaintiffs*

By: _____
Robert J. Tolchin
(D.C. Bar #NY0088)

829 East 15th Street, Box 7
Brooklyn, New York 11230
(718) 855-3627