**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WILLIAM WYATT**, *et al*., | |
| *Plaintiffs,* | |
| **v.** | Case No. 1:24-cv-39 (RCL) |
| **SYRIAN ARAB REPUBLIC**, | |
| *Defendant.* | |

**MEMORANDUM OPINION**

After Ronald Wyatt was abducted and held hostage in Turkey for twenty-one days in 1991 by terrorist members of the Kurdistan Workers Party ("PKK"), Wyatt's parents and siblings (or their estates) brought this suit against the Syrian Arab Republic under the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). Since Syria has failed to appear, default has been entered, and these plaintiffs now move for default judgment. *See* Mot. for Default J., ECF No. 27.

In many respects, this case mirrors one brought by Wyatt's spouse and children in 2012. *See Wyatt v. Syrian Arab Republic* ("*Wyatt I*"), 908 F. Supp. 2d 216 (D.D.C. 2012) (Lamberth, C.J.), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014). As in *Wyatt I*, this Court finds Syria liable for Ronald Wyatt's abduction. The Court cannot, however, grant default judgment to the estate plaintiffs asserting claims for injuries suffered during the decedents' lifetimes because the estates have not provided any evidence regarding their capacity to sue. As such, the Court will **GRANT IN PART** and **DENY IN PART** the plaintiffs' motion for default judgment against Syria.

**I.      PROCEDURAL HISTORY**

The plaintiffs initiated this suit against Syria on January 5, 2024. ECF No. 1. When other methods failed, service on Syria was made via diplomatic channels, as authorized by 28 U.S.C.

1

§ 1608(a)(4).  ECF Nos. 6, 7.  Syria failed to acknowledge the suit so, upon the plaintiffs' motion, the Clerk of this Court entered default against Syria.  ECF Nos. 9, 10.  The plaintiffs now move for default judgment against Syria.  Mot. for Default J., ECF No. 27.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 55(a) requires the Clerk of the Court, upon motion, to enter a party's default when the party "against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  But even when a foreign-state defendant fails to appear, the subsequent "entry of a default judgment is not automatic."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  The FSIA provides that "[n]o judgment by default shall be entered . . . against a foreign state . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).

A district court retains discretion "to determine precisely how much and what kinds of evidence the plaintiff must provide" to establish a right to relief.  *Han Kim v. Democratic People's Republic of Kor.*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).  In resolving a motion for default judgment in an FSIA case, "the quantum and quality of evidence that might satisfy a court can be less than that normally required."  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citation omitted), *vacated and remanded on other grounds sub nom.*, *Opati v. Republic of Sudan*, 590 U.S. 418 (2020).  But courts may not "simply accept a complaint's unsupported allegations as true."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp 2d 163, 171 (D.D.C. 2010).

## III.     FINDINGS OF FACT

When considering whether the plaintiffs have satisfied the default-judgment standard, the Court may look to "numerous evidentiary sources," such as documentary, testimonial, and affidavit evidence.  *Id*.  The Court may also "rely upon the evidence presented in earlier litigation—

2

without necessitating the formality of having that evidence reproduced."  *Id.* at 172; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 60 (D.D.C. 2010).  The plaintiffs here rely on judicial notice, declarations, and documentary evidence to support their motion for default judgment.

### A.  Judicial Notice

Courts may take judicial notice of evidence in prior related cases that is "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "This rule permits courts to take judicial notice of court records in related proceedings."  *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012).  But the Court must "reach [its] own, independent findings of fact" before entering default judgment notwithstanding the Court's decisions in prior cases involving the same issues.  *Rimkus*, 750 F. Supp. 2d at 172.

The plaintiffs here ask the Court to take judicial notice of the record in *Wyatt I*.  Mem. in Support of Mot. for Default J. ("Mem. Supp.") at 8–9, ECF No. 26-1.  The Court will therefore take judicial notice of the record in *Wyatt I*, while also finding certain facts anew.

### B.  The Kidnapping

In the fall of 1991, Ronald Wyatt, along with several travel companions, were driving with a guide in the mountains of Ararat in Turkey on a quest to locate the remnants of Noah's Ark when they came across a commercial passenger bus blocking the road.  Decl. of Marvin Wilson ¶¶ 5–6, ECF 16-1.  Several gunmen, who turned out to be PKK terrorists, emerged from the bus "yelling and screaming, and pointing their weapons" at Wyatt's group.  *Id.* ¶ 7.  The gunmen took the American and English travelers hostage, while allowing the non-Westerners to go free.  *Id.*

3

The armed men screamed at the captives while "pushing [them] around and roughing [them] up." *Id.* ¶ 8. The hostages were forced to walk "through the Turkish wilderness" throughout the night "at gunpoint," covering "at least 25 miles." *Id.* ¶ 9. One of Wyatt's companions recalls "falling on rocks and uneven ground and thorn bushes," while "icy winds" cut "through [his] soaking wet clothes." *Id.* ¶ 10. When morning came, the gunman allowed the hostages to sleep, albeit without shelter or protection from the cold. *Id.* ¶ 11.

The next several days followed the same pattern: the men would walk through the night and rest during the day. *Id.* ¶ 12–13. The captives were prohibited from speaking to each other and they received meager food rations. *Id.* The gunmen would sometimes try to indoctrinate their prisoners by showing them pictures of what they described as "Americans and Turks . . . killing innocent civilians." *Id.* ¶ 19. On a few occasions, PKK terrorists would rejoin the group after perpetrating attacks elsewhere, and they would tell the captives of how they had killed their victims. *Id.* ¶ 21.

After almost three weeks, the men reached a PKK encampment near a small town and the gunmen packed them into a car. *Id.* ¶ 23–24. While on the road, Wyatt attacked the driver in an attempt to escape, nearly resulting in a deadly car accident. *Id.* ¶ 24. Eventually the shaken driver returned the hostages to the location where they were abducted and abandoned them on the side of the road. *Id.* This was twenty-one days after the kidnapping. *Id.* ¶ 21.

Ronald Wyatt returned home with a badly injured leg that "never fully recovered." Declaration of Mary Nell Wyatt ¶ 11, ECF No. 16-2. He "always walked with a limp and after a few years, he often needed the assistance of a cane to get around." *Id.* As for his psychological state, his "demeanor changed for the worse." *Id.* In his wife's view, he was ruled by "pent up anger," constantly preoccupied, and at times severely anxious. *Id.*

4

### C.  Syria's Support for the PKK

The PKK is a terrorist organization that has, since the late 1970s, sought to establish an independent Kurdish state through acts of violence and terrorism.  *See* Expert Report of Dr. Matthew Levitt ("Levitt Report") at 8, ECF No. 16-6; Expert Report of Dr. Soner Cagaptay ("Cagaptay Report") at 2, ECF No. 16-7.  Though based in Turkey, the group was tightly associated with Syria at the time of Wyatt's abduction.  *See* Levitt Report at 9–10.  The relationship was such that, between 1980 and 1998, "Syria supported the PKK as a proxy against Turkey."  Cagaptay Report at 5, ECF No. 16-7.

Syria provided material support in myriad ways—such as by providing funding, training facilities, weapons, and safehouses.  Cagaptay Report at 4–5, ECF No. 16-7; Levitt Report at 10–12, ECF No. 16-6.  In fact, by the early 1990s, around 95% of the PKK's funding—about $10 million per year—came from the Syrian government, and this figure does not account for the monetary value of the training, weapons, and safehouses provided.  *Wyatt I*, Testimony of Marius Deeb, 08/12/2012 Evidentiary Hearing.

In short, "Syrian support was instrumental to the PKK's success in carrying out operations in Turkey during this period."  Cagaptay Report at 4, ECF No. 16-7.  And as one expert has explained, the PKK's total dependency on Syria means that it could not have conducted operations like Wyatt's abduction without Syrian Support.  *Wyatt I*, Testimony of Dr. Matthew Levitt, 08/12/2012 Evidentiary Hearing.  This is all the more apparent from the fact that the PKK had the open approval of top Syrian government leaders to conduct guerrilla assaults in Turkey.  *See* Levitt Report at 9, ECF No. 16-6 ("[T]he PKK was responsible for terrorist attacks in Turkey—including bombings and kidnappings of foreigners—even as its leader, Abdullah Ocalan, used Syria as his residence and base of operations, with Syrian Government knowledge and support." (quoting U.S.

DEP'T     OF     STATE,     *Patterns     of     Global     Terrorism     1992*,
http://www.fas.org/irp/threat/terror_92/sponsored.html     [https://perma.cc/95FP-TBWQ]));
Cagaptay Report at 4–5 (observing that, in 1991, "top PKK operatives and Syrian officials could
be seen consorting openly in Damascus," and the brother of Syrian President Hafez al-Assad
"personally visited PKK training camps" on at least one occasion).

### D.  The Plaintiffs' Status and Injuries

The Court now makes findings of fact regarding each plaintiff, including the injuries that
they have suffered due to Ronald Wyatt's abduction.  The plaintiffs in this suit consist of Ronald
Wyatt's parents and his ten siblings.  ECF No. 1.  All are (or were) United States nationals,[1] and
the family lived on a farm in rural Kentucky through the Great Depression.  Decl. of Freda Fay
(Wyatt) Hodge ("Freda Decl.") ¶ 3, ECF No. 19.  Ronald was the second oldest of the siblings.
Decl. of William Wyatt ("William Decl.") ¶ 4, ECF No. 17.  As described below, he maintained a
close relationship with his parents and siblings long after leaving home.

### 1.  Estate of Hobert William Wyatt

Ronald's father Hobert was born on March 23, 1911, and died on June 11, 2003.  William
Decl. ¶ 4, ECF No. 17.  He supported his family by farming land and selling religious books.  *Id.*
¶ 5.  During the period of Ronald Wyatt's abduction, Hobert and his wife "suffered immeasurably"
and the "atmosphere in [their] home was filled with anxiety."  *Id.* ¶ 15.  "Hobert was very nervous"
and deeply concerned about Ronald, a son with whom he "always had an especially close
relationship."  Declaration of Bessie Carol (Wyatt) Niswonger ("Carol Decl.") ¶ 6, ECF No. 18.
Even after Ronald Wyatt returned home, Hobert seemed extremely shaken by the ordeal.  Carol
Decl. ¶ 6, ECF No. 18.

---

[1] The plaintiffs have filed their birth records with the Court as evidence of their U.S. nationality.

### 2. Estate of Lottie K. Wyatt

Ronald's mother Lottie was born on October 20, 1912, and died on October 27, 1999. William Decl. ¶ 4, No. ECF 17. Lottie's children and in-laws describe her and her husband as "kind and gentle people whom everybody loved" and "a real salt of the earth couple" who worked hard and appreciated the small things. *See, e.g.*, Declaration of Rosemary Wyatt ("Rosemary Decl.") ¶¶ 3–4, ECF No. 23. Like her husband, Lottie was "very upset," to the point that she "could not function" during the period of Ronald's captivity, and she "spent the time praying for a miracle." Freda Decl. ¶ 9, ECF No. 19.

### 3. Estate of Kenneth Roger Wyatt

Roger was the eldest of the Wyatt children: he was born July 20, 1931, and died August 12, 1998. William Decl. ¶ 4, ECF No. 17. For many years, Ronald lived with and supported Roger, who suffered from life-long post-traumatic stress disorder ("PTSD") following his time in a North Korean prison camp. Carol Decl. ¶ 7, ECF No. 18. Ronald's abduction caused Roger to fall into a depression and "led him to drinking and years of emotional decline." *Id.*

### 4. Estate of Raymond Gary Wyatt

Ronald's brother Ray was the third oldest child; he was born October 16, 1935, and died July 10, 1997. William Decl. ¶ 4, ECF No. 17. Being so near in age, Ray and Ronald maintained "a very close relationship . . . since childhood." Freda Decl. ¶ 10, ECF 19. Ronald's abduction took a deep toll on Ray since his experiences serving in the Navy during the Korea and Vietnam Wars left him with "no illusions about the hardships" Ronald Wyatt had faced. *Id.*

### 5. Freda Wyatt Hodge

Ronald's sister Freda is the fourth oldest child and the oldest daughter, born May 3, 1938. William Decl. ¶ 4, ECF No. 17. Freda states that the "family was very close." Freda Decl. ¶ 3,

ECF 19.  As for her relationship with Ronald, she describes him as "a very good big brother" who was "protective" of his younger sisters.  *Id.* ¶ 4.  In their adulthood, Freda and Ronald "remained close and [their] children shared warm relationships."  *Id.* ¶ 5.  Frida suffered from "nightmares for many years" following the abduction and "became obsessively protective of [her] own children" for fear that something similar could happen to another loved one.  *Id.* ¶ 11.

### 6.  Bessie Carol Wyatt Niswonger

Ronald's sister Carol was born July 18, 1940.  William Decl. ¶ 4, ECF No. 17.  Carol describes life on a farm in rural Kentucky, where the family "all worked together in everything, and were very close."  Carol Decl. ¶ 2–3, ECF No. 18.  Even after Carol moved to the West Coast with her husband, Ronald would visit her, and they would see each other at their yearly family reunion.  *Id.* ¶ 3.  She describes her experience of the abduction as "extremely scary" and observes that she "would have fallen apart completely" had her faith not supported her.  *Id.* ¶ 5.

### 7.  Ruth Rogers

Ronald's sister Ruth was born January 25, 1943.  William Decl. ¶ 4, ECF No. 17.  After Ronald, Ruth was the second of the siblings to graduate high school.  Declaration of Ruth (Wyatt) Rogers ("Ruth Decl.") ¶ 2, ECF No. 24.  Ronald helped Ruth enroll in college and helped her find employment to pay for the costs of her education.  *Id.*  Later in life, Ruth looked after Ronald's children while he and Ruth's husband attended nursing school.  *Id.*  ¶ Ruth learned of the abduction on the way to the Wyatt family annual reunion in Kentucky, and when she arrived it seemed as if the news had "drained all of the life out of" the family.  *Id.* ¶ 7.  During Ronald's captivity in Turkey, she thought obsessively about him.  *Id.* ¶ 3.  In the aftermath of the ordeal, she had "reoccurring nightmares" and became "overly afraid of bad things happening to family members."  *Id.* ¶ 4.

### 8. Estate of Geneva Wyatt Rucker

Ronald's sister Geneva was born on August 20, 1944, and died February 2, 2022.  William Decl. ¶ 4, ECF No. 17.  When they were kids, Ronald "would always look out for" Geneva, as he did for his other younger siblings.  Declaration of Gary Rucker ("Rucker Decl.") ¶ 3, ECF No. 20. They lived near each other in their adulthood, and Ronald "was always a dependable force in Geneva's life, someone she could and did always turn to when she needed emotional support." *Id.* When Geneva learned of the abduction, "[s]he cried constantly and could not be consoled," overcome with "despair that [Ronald] would die." *Id.* ¶ 4.  After a while, though, Geneva "started working the phones calling anyone she knew with influence to find someone who could intercede to help" bring Ronald home.  *Id.* ¶ 5.  According to her son, she became "uncharacteristically stoic" in the face of death and hardship after the ordeal, as if "her emotions were repressed." *Id.* ¶ 7.

### 9. William Wyatt

Ronald's brother William was born May 5, 1947.  William Decl. ¶ 4, ECF 17.  William describes Ronald as "the backbone of the family, particularly as [their] parents got older." *Id*. ¶ 9. After William returned from the Vietnam War with shrapnel in his leg and PTSD, Ronald helped William "deal with the emotional aftermath of [his] injuries." *Id.* ¶¶ 9–10.  At the family reunion in Kentucky during the abduction, William recalls "pass[ing] this difficult time" by "speaking to [his] parents and siblings" and "trying [his] best [to] comfort them." *Id.* ¶ 14.

### 10. Rita Wyatt Fordyce

Ronald's youngest sister Rita was born October 31, 1949.  William Decl. ¶ 4, ECF No. 17. Rita describes Ronald as the family's "protector," who always came to the aid of his siblings and parents.  Declaration of Rita (Wyatt) Fordyce ("Rita Decl.") ¶ 5, ECF No. 22.  Rita would attend Ronald's seminars on his research into biblical archaeology, and he would visit her even when she

lived many states away. *Id.* ¶ 6.  During the period of the abduction, Rita "could not sleep or eat" and found it "very difficult . . . to maintain a daily routine."  *Id.* ¶ 9.  After Ronald was released, Rita began taking care of her elderly parents who were "depleted" by the ordeal.  *Id.* ¶ 3.

### 11. Ralph Wyatt

Ronald's brother Ralph was born January 22, 1952.  William Decl. ¶ 4, ECF No. 17. Ronald was nineteen years older than Ralph and the younger brother saw Ronald at his "idol." Declaration of Ralph Wyatt ("Ralph Decl.") ¶ 3, ECF No. 21.  After graduating high school, Ralph lived with Ronald, and they "spend many hours discussing life, and studying bible verses together."  *Id.* ¶ 4.  Ralph was close with his sister Geneva, with whom he was closer in age, and he recalls that they both experienced "intense helplessness" while Ronald was abducted.  *Id.* ¶ 5.

### 12. Estate of Donald Earl Wyatt

Ronald Wyatt's youngest brother Earl was born August 15, 1954, and died June 4, 2020. William Decl. ¶ 4, ECF No. 17.  As "the kid brother," Earl "looked up to and greatly admired" Ronald, "who was something of a hero to him."  Rosemary Decl. ¶ 8, ECF No. 23.  In his adulthood, Earl did not have it easy: he was discharged from the Army during the Vietnam War due to a psychological disability, and a few years later, he was shot during a robbery while working at a gas station. *Id.* ¶ 7.  Earl's widow describes him as being "in a very fragile place emotionally" during the time of the abduction, and he required "psychological counseling to help him cope" with the fear that Ronald would never return home.  *Id.* ¶ 8–9.

## IV.    CONCLUSIONS OF LAW

### A.  Subject-Matter Jurisdiction

Before the Court can assess the merits, it must assure itself of its subject-matter jurisdiction. *See Cornish v. Dudas*, 715 F. Supp. 2d 56, 60 (D.D.C. 2010).  The FSIA grants district courts

"original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a). A foreign-state defendant is not entitled to immunity in suits where money damages are sought for personal injury that was caused by an act of hostage taking, or the provision of material support or resources for such an act. *Id.* § 1605A(a)(1); *see also Fuld v. Islamic Republic of Iran*, No. 20-cv-2444 (RCL), 2024 WL 1328790, at \*10 (D.D.C. Mar. 28, 2024).[2] Finally, a federal district court "shall hear a claim" when, as in this case, "the foreign state was designated a state sponsor of terrorism at the time of the act" giving rise to liability, and the victim was, at the time the act occurred, "a national of the United States." 28 U.S.C. § 1605A(a)(2)(A).[3]

The plaintiffs here seek money damages against a foreign state—namely, Syria—which is not entitled to sovereign immunity because the plaintiffs' "claims arise out of Syria's provision of material support to a terrorist organization responsible for the kidnapping of . . . Wyatt which resulted in 'personal injury' to" him. *Wyatt I*, 908 F. Supp. 2d at 227–28.

The plaintiffs provide expert testimony demonstrating that Syria provided many forms of material support to the PKK, such as weapons, shelter, and training. *See supra* Part III.C.; *see also* 28 U.S.C. § 1605A(h)(3) (incorporating the definition of "material support or resources" found in 18 U.S.C. § 2339A, which includes "any property . . . or service, including lodging, training, expert

---

[2] "[T]he FSIA does not restrict the personal injury or death element to injury or death suffered directly by the claimant; instead, such injury or death must merely be the basis of a claim for which money damages are sought." *Fuld v. Islamic Republic of Iran*, No. 20-CV-2444-RCL, 2024 WL 1328790, at \*10 (D.D.C. Mar. 28, 2024). So, for purposes of subject-matter jurisdiction, the Court need only consider whether the injuries to Ronald Wyatt (not those to his parents and siblings) were caused by Syria's material support of the hostage taking.

[3] In addition, if "the act occurred in the foreign state against which the claim has been brought," the claimant must have "afforded the foreign state a reasonable opportunity to arbitrate" the claim. *Id.* § 1605A(a)(2)(A)(iii). But here the abduction took place in Turkey—not Syria—meaning that the plaintiffs need not afford Syria an opportunity to arbitrate their claims.

advice, . . . safehouses, . . . facilities, [and] weapons"). As for whether Syria's support *caused* Ronald Wyatt's abduction, the plaintiffs must show "some reasonable connection" between the defendant's act and the injury suffered. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (quoting PROSSER & KEETON ON THE LAW OF TORTS 263 (5th ed. 1984)). There is a "reasonable connection" between Syria's support of the PKK and Ronald's injuries to sustain jurisdiction because the plaintiffs' evidence demonstrates that the PKK was entirely dependent on Syria's sponsorship: this terrorist group could not have carried out operations in Turkey without the support of Syria as its primary benefactor. *See supra* Part III.C. Further, since terrorist acts such as Wyatt's abduction were foreseeable and intended consequences of Syria's support, the Court concludes that Wyatt's injury is sufficiently proximate (or "reasonably connected") to Syria's actions.

Finally, this Court shall hear the plaintiffs' claims because Wyatt was a United States national and the State Department has continuously designated Syria as a state sponsor of terrorism since 1979. *See* U.S. DEP'T OF STATE, *State Sponsors of Terrorism*, http://www.state.gov/j/ct/list/c14151.htm [https://perma.cc/EEL8-UBGQ].

### B. Personal Jurisdiction

A court has "an independent obligation . . . to satisfy itself of its personal jurisdiction before entering a default [judgment] against a missing party." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018). Under 28 U.S.C. § 1330(b), federal courts have personal jurisdiction over a foreign state if (1) the court has original jurisdiction under § 1330(a), and (2) the plaintiffs properly effectuate service under 28 U.S.C. § 1608. As explained above, § 1330(a)'s requirements for original jurisdiction are met here. *See supra* Part IV.A. The

remaining issue is only whether plaintiffs have satisfied the procedural requirements for service of process in § 1608.

"The FSIA prescribes four valid methods of service, listed in order of preference." *Fuld*, 2024 WL 1328790, at *12. "If a method of service is unavailable or unsuccessful, a plaintiff may attempt the next method available." *Id.* First, if possible, a plaintiff must attempt to reach a "special arrangement" with the foreign state for service. 28 U.S.C. § 1608(a)(1). Second, a plaintiff may serve the defendant "in accordance with an applicable international convention" on service of process. *Id.* § 1608(a)(2). No special arrangement or international convention with Syria exists here, so neither method of service was available to the plaintiffs.

As a result, the plaintiffs attempted service on Syria under the third option, which required them to mail the requisite documents to Syria. ECF No. 3; 28 U.S.C. § 1608(a)(3) (permitting service by having the clerk of court "address[] and dispatch[]" the complaint summons and notice of suit "to the head of the ministry of foreign affairs of the foreign state concerned"). When that failed, plaintiffs resorted to the fourth and final method by serving Syria through diplomatic channels, as permitted by § 1608(a)(4). ECF No. 4. The Clerk of the Court mailed these documents on January 31, 2024. ECF No. 6. According to the State Department, the documents were served under cover of diplomatic note to Syria in May 2024. ECF No. 7. The Court concludes that plaintiffs have complied with § 1608(a)(4) and have properly served Syria in accordance with the FSIA, so the Court may exercise personal jurisdiction over the defendant.

### C. Statute of Limitations

Actions under § 1605A "may be brought or maintained" only if filed "not later than" (1) "10 years after April 24, 1996," or (2) "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b). Time bars under the FSIA's terrorism exception "have long been treated

as nonjurisdictional affirmative defenses that may be waived if not timely asserted by a defendant," and the Court has no authority to enforce such limitations if the issue is not raised. *Fuld*, 2024 WL 1328790, at *13; *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019) ("We conclude that no such authority exists for a federal court to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant."). Because Syria chose to ignore this suit, the Court need not assess time limitations.

### D. Estate-Plaintiffs' Standing

The deceased plaintiffs in this action are represented through their estates. In FSIA cases, the Court must evaluate whether "estate plaintiffs who bring claims for injuries suffered during the decedent's life have standing." *Est. of Farhat v. Islamic Republic of Iran*, No. 19-cv-03631 (RCL), 2024 WL 706971, at *16 (D.D.C. Feb. 21, 2024); *see also Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014) (holding that estate plaintiffs "must establish their standing before they may recover for harms suffered during the decedent's lives"). This is because, unlike a right of action directly related to the decedent's death, damages for injuries suffered during the decedent's lifetime are not "universally available to estate-plaintiffs." *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011).

An estate has statutory standing to bring a cause of action under 28 U.S.C. § 1605A(c)(4) if the decedent would have had standing to sue (if he were still living) and the action is brought by a "legal representative" with the authority to stand in the shoes of the decedent. *See also* Fed. R. Civ. P. 17(a)(1), (b)(3). Here, the decedents of the estate plaintiffs would have had standing to sue because they were U.S. citizens who were injured by Syria's sponsorship of Wyatt's abduction. *See* 28 U.S.C. § 1605A(c)(1). Nevertheless, a question remains regarding whether the representatives of the estates have the capacity to sue under these circumstances.

Even though the plaintiffs have brought federal claims, state law governs "whether an estate may maintain a cause of action for injuries suffered during the decedent's life." *Worley*, 75 F. Supp. 3d at 333.  This is so because the issue of whether an estate has the capacity to sue "is not related to the extent and nature of the claims at issue, but instead involves a threshold question regarding the 'power of the estate to bring and maintain' such claims."  *Id.* (quoting *Taylor*, 811 F. Supp. 2d at 12).

The estate plaintiffs present no evidence or argument as to what law governs their creation, nor have they presented any evidence as to whether the applicable state law allows such estates to sue for solatium damages.  It is the estate plaintiffs' duty to provide "evidence satisfactory to the court." 28 U.S.C. § 1608(e).  Because the estate plaintiffs have presented no evidence regarding which state laws govern this question, the Court cannot grant default judgment on their claims. The Court will, however, deny the estate-plaintiffs' claims without prejudice and with leave to supplement and refile their motion to address these issues.

### E.  Liability

The Court now turns to Syria's liability as to the remaining plaintiffs.  The FSIA's state-sponsored terrorism exception provides a private right of action, 28 U.S.C. § 1605A(c), which states:

> A foreign state that is or was a state sponsor of terrorism . . . shall be liable to . . . a national of the United States . . . for personal injury . . . caused by [the foreign state's material support of a hostage taking] . . . for which the courts of the United States may maintain jurisdiction under this section for money damages.

The Court observes that "[a]lthough an analysis of a foreign sovereign's potential immunity and liability should be conducted separately, the elements of immunity and liability" under § 1605A(a)(1) and § 1605A(c) "are essentially the same." *Wyatt I*, 908 F. Supp. 2d at 230 (quoting *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010)).  To determine

whether the plaintiffs in this suit come within this cause of action, two additional steps of analysis are necessary. First, the Court acknowledges that each plaintiff here is either a United States national or the legal representatives of a United States national. *See* Part III.D. Second, the Court must assess whether that these plaintiffs have proven a sufficient causal connection between the abduction and their own injuries to justify the damages they seek.

The plaintiffs assert psychological injuries in the form of emotional distress stemming from the PKK terrorist attack involving Ronald Wyatt. "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Est. of Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (citing RESTATEMENT (SECOND) OF TORTS § 46(1)). Recovery for this type of harm is limited to the members of the victim's immediate family—which includes "parents [and] siblings." *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 123 (D.D.C. 2012).

Beginning with the obvious, "a terrorist attack constitutes extreme and outrageous conduct." *Bodoff v. Islamic Republic of Iran,* 424 F. Supp. 2d 74, 85 (D.D.C. 2006). The declarations of Ronald Wyatt's family members demonstrate that his parents and siblings suffered immensely during and after the period of his abduction. By bankrolling and otherwise supporting the terrorist organization responsible for Wyatt's abduction, Syria recklessly caused severe emotional distress to Wyatt's immediate family members. The Court therefore concludes that the plaintiffs have established Syria's liability under § 1605A(c) for the psychological injuries caused by the abduction.

## V.    DAMAGES

To recover, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 242–43 (D.D.C. 2012) (quoting *Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 160 (D.D.C. 2009)). Damages available under § 1605A "include . . . solatium . . . and punitive damages." 28 U.S.C. § 1605A(c).

### A.  Solatium Damages

"Solatium under the FSIA is functionally identical to" claims of intentional infliction of emotional distress. *Fuld*, 2024 WL 1328790, at *18. It is a form of damages intended to compensate persons for "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (citation omitted). "Courts may presume that those in direct lineal relationships with victims of terrorism"—such as parents—"suffer compensable mental anguish." *Fuld*, 2024 WL 1328790, at *18. Siblings, however, must provide evidence "proving a close emotional relationship . . . to sustain an award of solatium damages." *Id.*; *see also Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998).

As many of Ronald Wyatt's siblings explain, his abduction "touched a raw nerve" for a family that had already suffered a series of hardships—from surviving the Great Depression in rural Kentucky to living through multiple wars in which several sons returned home physically and psychologically injured. *See, e.g.*, Rita Decl. at ¶ 3, ECF 22. The abduction was especially traumatic since Ronald was the "backbone" of the family, providing stability and support to his siblings and aging parents. William Decl. ¶ 9, ECF 17. After considering the plaintiffs' evidence,

the Court concludes that each family member has sufficiently demonstrated the sort of personal connection with Ronald Wyatt and mental anguish resulting from his kidnapping to support an award of solatium damages.

In *Estate of Heiser*, this Court developed a standardized approach for evaluating emotional-distress claims for solatium damages by surveying past awards to family members of terrorism victims. The Court determined that "[s]pouses typically receive greater damage awards than parents, who, in turn, typically receive greater awards than siblings." *Est. of Heiser*, 466 F. Supp. 2d at 269. Consistent with the practice of relying on past average awards, the Court awards $1.25 million to each of Ronald Wyatt's living siblings. *See id.*; *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213–14 (D.D.C. 2012) (applying the *Heiser* framework to a case involving a hostage taking); *Wyatt I*, 908 F. Supp. 2d at 232 (same).

## B. Punitive Damages

The plaintiffs also seek punitive damages. *See* Mem. Supp. at 19, ECF No. 26-1. Punitive damages serve to punish and deter the actions for which they are awarded, rather than to compensate the victim. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009). Calculating punitive damages as "a multiplier of three" of the compensatory damages is "the usual practice in state sponsored terrorism cases." *See Roth v. Syrian Arab Republic*, No. 14-cv-01946 (RCL), 2018 WL 4680270, at *17 (D.D.C. Sep. 28, 2018). But the typical terrorism case often involves violent killings and bodily harm. *See e.g.*, *id.* (punitively trebling compensatory damages for state sponsorship of a bombing); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 105–06 (D.D.C. 2017) (same for plaintiffs injured in a shooting); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (same for state sponsorship of videotaped executions).

The Court does not minimize Syria's culpability in sponsoring the PKK, but the character of abduction and the lack of severe physical injury to the victim and plaintiffs suggests that a downward adjustment from the typical multiplier of three is appropriate here. The Court will therefore award each plaintiff who is entitled to relief $1 million in punitive damages. So Wyatt's living siblings will be awarded $1 million in punitive damages each. ECF No. 27.

## VI.    CONCLUSION

For the above-mentioned reasons, the Court will **GRANT IN PART** and **DENY IN PART** plaintiffs' Motion for Default Judgment. The Court will **GRANT** plaintiffs' motion with respect to Syria's liability on the claims brought by Ronald Wyatt's living siblings. But the Court must **DENY** plaintiffs' motion as the claims brought by the estate plaintiffs. A separate order and judgment consistent with this opinion shall issue on this date.

Date: September __ 2025

Royce C. Lamberth
United States District Judge

19